**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**THE RESEARCH**
**FOUNDATION OF STATE**
**UNIVERSITY OF NEW YORK,**

                **Plaintiff,**              **1:09-cv-1292**
                                        **(GLS/CFH)**

          **v.**

**NEKTAR THERAPEUTICS,**

                **Defendant.**
_____

| APPEARANCES: | OF COUNSEL: |
|---|---|
| **FOR THE PLAINTIFF:** | |
| Bond, Schoeneck Law Firm | DAVID L. NOCILLY, ESQ. |
| One Lincoln Center | STUART F. KLEIN, ESQ. |
| Syracuse, NY 13202 | |
| | |
| Fish, Richardson Law Firm | IRENE E. HUDSON, ESQ. |
| 601 Lexington Avenue - 52nd Floor | BRIAN D. COGGIO, ESQ. |
| New York, NY 10022 | CINDY CHANG, ESQ. |
| | DAVID FRANCESCANI, ESQ. |
| | ELIZABETH E. BRENCKMAN, ESQ. |
| | JENNIFER N. SCARPATI, ESQ. |
| | YOUNG J. PARK, ESQ. |
| | |
| **FOR THE DEFENDANT:** | |
| O'Melveny, Myers Law Firm | CHARLES E. BACHMAN, ESQ. |
| 7 Times Square | DANIEL J. FRANKLIN, ESQ. |
| Times Square Tower | LEAH GODESKY, ESQ. |
| New York, NY 10036 | ROBERTA HARTING VESPREMI, ESQ. |

Iseman, Cunningham Law Firm          JAMES P. LAGIOS, ESQ.
9 Thurlow Terrace
Albany, NY 12203

**Gary L. Sharpe**
**Chief Judge**

## MEMORANDUM-DECISION AND ORDER

### I. Introduction

Plaintiff The Research Foundation of State University of New York ("RF SUNY") commenced this diversity action against defendant Nektar Therapeutics seeking specific performance, damages, and declaratory relief. (*See* 2d Am. Compl., Dkt. No. 67.) Pending are Nektar's motions for summary judgment dismissing the Second Amended Complaint and sanctions due to spoliation of evidence. (*See* Dkt. Nos. 153, 154; *see also* Dkt. No. 156.[1]) RF SUNY has separately moved for partial summary judgment. (*See* Dkt. No. 155.) For the following reasons, Nektar's motion for summary judgment is granted to the limited extent that it seeks dismissal of RF SUNY's claim for specific performance. Nektar's motion

---

[1] The court notes that Nektar's letter motion seeking permission to file a corrected memorandum of law and statement of material facts in support of its motion for summary judgment is granted, and those documents are deemed filed. (*See* Dkt. No. 156.)

for summary judgment is denied in all other respects.  Moreover, upon searching the record, the court grants summary judgment to RF SUNY on a narrow issue discussed below, denies RF SUNY's motion for partial summary judgment, and denies Nektar's motion for sanctions due to spoliation of evidence.

## II. Background

**A.  Facts**[2]

In 2003, RF SUNY, "a non-profit educational corporation" operating "pursuant to an agreement with the State University of New York [(SUNY)] to administer sponsored research programs for and on behalf of SUNY," and Nektar, a Delaware corporation and "clinical-stage biopharmaceutical company," entered into a contract (hereinafter "the Agreement") related to certain technology developed by Drs. Gerald Smaldone and Lucy Palmer, employees of SUNY.  (Pl.'s Statement of Material Facts (SMF) ¶¶ 1-2, 7, 14, Dkt. No. 155, Attach. 2; Def.'s SMF ¶¶ 4, 14, Dkt. No. 156, Attach. 2.)

---

[2] Unless otherwise noted, the facts are undisputed.  The court also notes that, while the parties have taken great pains to protect certain documents from becoming public, (*see, e.g.*, Dkt. No. 55), the materials relied upon by the court are drawn from publicly-filed documents that have been attached to the parties' motion papers.

The technology relates to, among other things, "methods for evaluating the utility of various means and devices to deliver aerosolized agents to the lung." (Dkt. No. 154, Attach. 4 at 37.)

Under the Agreement, Nektar, which was granted an "exclusive license to the [RF SUNY] Patents and Technology, and the right to sublicense" the same, is obligated to pay RF SUNY "a fraction of Gross Sublicensing Revenues" (GSR). (Pl.'s SMF ¶ 24; Dkt. No. 154, Attach. 4, at 9.) The Agreement defines GSR as:

> "all non-refundable or non-creditable milestone payments or option or license fees [Nektar] and its Affiliates receive from any non-Affiliated third party in consideration of an option to negotiate for a license or other authorization to practice TECHNOLOGY or Licensed Patents, and any milestone payments or option or license fees [Nektar] and its Affiliates receive from any non-Affiliated third party pursuant to a license, sublicense or other authorization to practice TECHNOLOGY or Licensed Patents. Royalties, amounts received to fund or reimburse research and development activities of [Nektar] and its Affiliates (including without limitation, reimbursement of those amounts incurred by [Nektar] and its Affiliates prior to granting an option to negotiate for a license or other authorization to practice TECHNOLOGY or Licensed Patents, or a license, sublicense or other authorization to practice TECHNOLOGY or Licensed Patents, as well as those amounts paid by [Nektar] to [RF SUNY] in connection with the research and development of Products), lines of credit to purchase

capital related to the development or manufacture of Products, and amounts received by [Nektar] and its Affiliates for the manufacture and supply of Products (including Products for clinical trials) are not Gross Sublicensing Revenues hereunder."

(Dkt. No. 154, Attach. 4 at 35.)  This provision is at the heart of the parties' dispute.

The technology is part of what Nektar calls the "Amikacin Program." (Def.'s SMF ¶ 41.)  In 2006, Bayer Healthcare LLC "expressed interest in jointly developing the Amikacin Program with Nektar." (*Id.* ¶ 69.)  Bayer's interest culminated in a contract with Nektar (hereinafter "the Bayer Agreement") that, in part, granted Bayer sublicensing rights to the technology. (*Id.* ¶¶ 81-82.)  The Bayer Agreement required Bayer to make "several 'milestone payments' if Nektar achieved certain milestone events, including execution of the [Bayer Agreement] itself." (Pl.'s SMF ¶ 34.)  The first milestone payment of $50 million, which was due forty-five days from the Bayer Agreement's effective date, was characterized in the agreement as "reimbursement by Bayer for Nektar's past investment in PDDS Platform Technology, and including partial reimbursement for acquisition of Aerogen assets in connection with Exploitation of the Product." (Dkt. 154, Attach. 17 at 40; *see* Def.'s SMF ¶ 84.)  In 2005, prior to negotiation or

execution of the Bayer Agreement, Nektar had acquired Aerogen, Inc. and its intellectual property assets, which included a platform, known as PDDS, to deliver an inhaled antibiotic.  (Def.'s SMF ¶ 44; Dkt. No. 154, Attach. 56 at 9; Dkt. 154, Attach. 61 at 23.)  Bayer timely made the first milestone payment of $50 million.  (*See* Def.'s SMF ¶ 101.)  Bayer made a second milestone payment of $10 million to Nektar in May 2008.  (*See id.* ¶ 123.)  The Bayer Agreement required Nektar to use the second milestone to reimburse Bayer's development costs of conducting any "Phase III Clinical Trial."  (Dkt. No. 154, Attach. 17 at 40-41.)  Additional milestone payments may become due over the life of the Bayer Agreement depending upon the occurrence of certain events; the final such payment would become due upon the commercial launch of a particular product.  (*See id.* at 40.)

On October 20, 2008, Nektar and Novartis Pharmaceuticals Corp. and Novartis Pharam AG (collectively "Novartis") "executed an asset purchase agreement under which Nektar transferred certain physical and intellectual property assets to Novartis in exchange for $115 million" (hereinafter "the Novartis Agreement").  (Def.'s SMF ¶ 129; *see id.* ¶ 25.)  While the Agreement was specifically excluded from the transfer of assets from Nektar to Novartis, (*see* Dkt. No. 154, Attach. 35 at 2), the Novartis

Agreement granted Novartis an option to sublicense RF SUNY's technology upon request (*see* Def.'s SMF ¶ 141; Dkt. No. 154, Attach. 34 at 50).

In July 2009, RF SUNY retained accountant Daniel Burns to "review Nektar's [research and development (R&D)] expenses associated with the Amikacin Program through an audit" expressly permitted under the Agreement. (Def.'s SMF ¶ 47.; Dkt. No. 154, Attach. 4 at 14.) More specifically, the audit was intended "to determine whether Bayer's payments to Nektar 'were reimbursement for past R&D costs.'" (Def.'s Resp. SMF ¶ 58, Dkt. No. 157, Attach. 1.) This litigation followed soon after.

## B.    <u>Procedural History</u>

RF SUNY commenced this action in November 2009. (*See* Compl., Dkt. No. 1.) After filing an amended complaint with the court's permission, RF SUNY filed the operative Second Amended Complaint in accordance with a stipulation of the parties. (*See* Dkt. Nos. 46, 47, 62; 2d Am. Compl.) In its pleading, RF SUNY asserts claims for specific performance of its auditing rights, breach of contract regarding the Bayer Agreement and Novartis Agreement, a declaration of contractual rights and future

obligations under the Agreement, and a breach of the implied duty of good faith and fair dealing with respect to Nektar's negotiation, drafting, execution and/or performance of the Bayer Agreement.  (*See* Dkt. No. 67 ¶¶ 76-102.)  After joinder of issue and the completion of discovery, the parties filed the instant motions.  (*See* Dkt. Nos. 68, 153, 154, 155.)

### III.  Standard of Review

**A.      Summary Judgment**

The standard of review pursuant to Fed. R. Civ. P. 56 is well established and will not be repeated here.  For a full discussion of the standard, the court refers the parties to its decision in *Wagner v. Swarts*, 827 F. Supp. 2d 85, 92 (N.D.N.Y. 2011).

**B.      Spoliation of Evidence**

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation."  *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999).  A party seeking an adverse inference instruction based on spoliation must show that: (1) a duty to preserve the evidence existed at the time it was destroyed; (2) the evidence was "destroyed with a culpable state of mind;" and (3) the "evidence was

relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Twitty v. Salius*, 455 F. App'x 97, 99 (2d Cir. 2012) (internal quotation marks and citation omitted). The necessary showing of culpability, which poses a legal question for the court to decide, is determined *sui generis*, but may be supported by proof of intentional destruction, bad faith, gross negligence, or ordinary negligence. *See Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 109 n.4 (2d Cir. 2002); *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 108 (2d Cir. 2001); *GenOn Mid-Atl., LLC v. Stone & Webster, Inc.*, 282 F.R.D. 346, 358 (S.D.N.Y. 2012). Other than the relative nature of the terms, there are no concrete definitions for the states of mind relevant to this case—gross and ordinary negligence.

"[A] showing of gross negligence in the destruction or untimely production of evidence will *in some circumstances* suffice, standing alone, to support a finding that the evidence was unfavorable to the grossly negligent party." *Residential Funding Corp.*, 306 F.3d at 109 (emphasis added). Thus, the same evidence establishing gross negligence "will *frequently* also be sufficient to permit a jury to conclude that the missing evidence is favorable to the party (satisfying the 'relevance' factor)." *Id.*

(emphasis added).[3]

## IV. Discussion

### A. Summary Judgment

#### 1. Nektar's Motion

The court addresses first Nektar's motion. Nektar argues that, because the unambiguous language defining GSR in the Agreement excludes reimbursements for R&D and refundable milestone payments, RF SUNY's claim for breach of contract regarding Bayer's first and second milestone payments should be dismissed because they were not GSR. (*See* Dkt. No. 156, Attach. 1 at 18-20.) Regarding the Novartis breach of contract claim, Nektar contends that the payment it received from Novartis

---

[3] Nektar, relying on *GenOn*, overstates the law in this regard, claiming that a showing of gross negligence automatically entitles it to a rebuttable presumption that the third prong is met. *See GenOn*, 282 F.R.D. at 358; (Dkt. No. 162 at 9.) Indeed, this court is aware of no such pronouncement by the Second Circuit, and a careful reading of the other case Nektar relies upon, *Orbit One Communications, Inc. v. Numerex Corp.*, 271 F.R.D. 429, 441 (S.D.N.Y. 2010), (see Dkt. No. 162 at 9 n.16), confirms the proper rule of law: "once it has been established that discovery-relevant material has been destroyed in bad faith or through gross negligence, it may be presumed that it would have been harmful to the spoliator." (emphasis added); *see Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 162 (2d Cir. 2012) ("[A] finding of gross negligence merely permits, rather than requires, a district court to give an adverse inference instruction.").

is not GSR because it did not transfer the technology to Novartis. (*See id.* at 20-21.) Moreover, Nektar claims that the Novartis payment is not GSR because the option it was granted "has no value." (Dkt. No. 163 at 6; *see* Dkt. No. 156, Attach. 1 at 31 n.13.) Generally speaking, Nektar argues that RF SUNY's interpretation of the Agreement is flawed, and that extrinsic evidence cannot be considered to interpret it. (*See* Dkt. No. 156, Attach. 1 at 21-25.) Alternatively, Nektar asserts that, if extrinsic evidence may be considered, it demonstrates that the first milestone payment "was a reimbursement of [its] R&D expenditures and that [it] did not transfer the . . . [t]echnology to Novartis." (*Id.* at 25-35.)

Moving on to RF SUNY's claim for breach of the implied covenant of good faith and fair dealing related to the Bayer Agreement, Nektar argues that it too should be dismissed because: (1) it is duplicative of RF SUNY's breach of contract claim; (2) the Agreement cannot be read to imply a term in direct conflict with its express language; and (3) there is no evidence of breach by virtue of the fact that Nektar merely permissibly exercised its contractual rights. (*See id.* at 35-43.) Nektar next contends that RF SUNY's remaining claim of specific performance is moot and is a remedy—as opposed to a cause of action—and that no independent cause

11

of action lies for a "declaration of contractual rights and future obligations." (*Id.* at 44-45.)

In response, RF SUNY asserts that Nektar's interpretation of the Agreement is invalid. (*See* Dkt. No. 159 at 18-25.) In particular, RF SUNY argues that the Bayer milestone payments are GSR because, under the Agreement, the reimbursement exclusion to the GSR provision only applies to non-milestone payments, and only refundable payments made "in consideration of an option to negotiate for a license or other authorization to practice" avoid the GSR provision. (*Id.* at 18-20.) RF SUNY also urges the court to adopt its definition of the term "reimbursement," which it contends "requires a prior obligation to repay," i.e., "repayment for past services requested." (*Id.* at 21-25.) In the event that the court does not hold that "reimbursement" requires some prior obligation, RF SUNY argues that issues of fact—namely, whether the opinion of its accounting expert Steven Stanton demonstrates that Bayer's first milestone payment was not a bona fide reimbursement, Nektar's tax and accounting treatment of the first milestone payment suggests the same, and Nektar's claim that certain expenses were part of R&D has been called into question by Stanton and RF SUNY's licensing expert Mark Edwards—exist which require denial of

Nektar's motion as to the first milestone payment.  (*See id.* at 25-33.)

As for the Novartis payment, RF SUNY asserts that whatever portion of that payment is attributable to the option that Nektar granted Novartis is GSR.  (*See id.* at 33-34.)  Moving to its claim of breach of the implied covenant of good faith and fair dealing, RF SUNY alleges that it is not duplicative of the breach of contract claim pertaining to the Bayer Agreement because it is premised upon Nektar's conduct in the formation of the Bayer Agreement as opposed to its purported breach of the Agreement.  (*See id.* at 39-41.)  Moreover, RF SUNY contends that Nektar's argument that it was merely acting within the scope of the Agreement is belied by the fact that the Agreement does not permit Nektar to intentionally avoid the GSR payment provision.  (*See id.* at 41-42.) Finally, RF SUNY argues that its remaining claims for specific performance and declaratory judgment should not be dismissed.  (*See id.* at 42-43.) Specific performance, RF SUNY claims, is supported by Nektar's independent breach of the Agreement for failing to comply with its requests related to the audit; and declaratory relief is appropriate with respect to Nektar's pronouncement that it will "continue to deduct its [R&D] expenses from any monies due [RF SUNY] under the GSR-sharing provisions in the

13

[A]greement." (*Id.*)

Initially, the court notes that the Agreement is governed by New York law. (*See* Def.'s SMF ¶ 29; Dkt. No. 156, Attach. 1 at 18 n.10.) Under New York law, "[t]he elements of a cause of action for breach of contract are (1) formation of a contract between plaintiff and defendant; (2) performance by plaintiff; (3) defendant's failure to perform; and (4) resulting damage." *Clearmont Prop., LLC v. Eisner*, 58 A.D.3d 1052, 1055 (3d Dep't) (internal quotation marks and citation omitted). The defendant's performance, or nonperformance as the case may be, often turns on interpretation of the parties' agreement.

If the contractual language is clear and unambiguous, the court, as a matter of law, enforces the provisions in accordance with their plain and ordinary meaning. *See Vintage, LLC v. Laws Constr. Corp.*, 13 N.Y.3d 847, 849 (2009). Where ambiguity is absent from the contract, extrinsic evidence generally cannot be considered in its interpretation. *See W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990). "Ambiguity is present if language was written so imperfectly that it is susceptible to more than one reasonable interpretation." *Brad H. v. City of N.Y.*, 17 N.Y.3d 180, 186 (2011). Whether an agreement is ambiguous is a question of law

answered by the court.  *See Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, 13 N.Y.3d 398, 404 (2009).  And "[w]hen the interpretation of an ambiguous contract depends on extrinsic evidence, it presents a question of fact for a jury."  *See Arrow Commc'n Labs., Inc. v. Pico Prods., Inc.*, 219 A.D.2d 859, 860 (4th Dep't 1995); *see also Sutton v. E. River Sav. Bank*, 55 N.Y.2d 550, 554 (1982).

First, the court notes that, in some ways, the language of the Agreement is ambiguous, and yet, in other ways, it is unambiguous. Beginning with the first Bayer milestone payment, the Agreement itself states that:

> [r]oyalties, amounts received to fund or **reimburse [R&D] activities of [Nektar] and its Affiliates** (including without limitation, reimbursement of those amounts incurred by [Nektar] and its Affiliates prior to granting an option to negotiate for a license of other authorization to practice TECHNOLOGY or Licensed Patents, or a license, sublicense or other authorization to practice TECHNOLOGY or Licensed Patents, as well as those amounts paid by [Nektar] to [RF SUNY] in connection with the research and development of Products), lines of credit to purchase capital related to the development or manufacture of Products, and amounts received by [Nektar] and its Affiliates for the manufacture and supply of Products (including Products for clinical trials) **are not Gross Sublicensing Revenues** hereunder"

(hereinafter "the reimbursement exclusion clause"). (Dkt. No. 154, Attach. 4 at 35 (emphasis added).) The parties disagree as to the meaning of the word "reimburse," with RF SUNY contending that reimbursement connotes a "prior obligation to repay." (Dkt. No. 159 at 21-25.) Despite the commentary in *Mathisen ex rel. Mathisen v. Secretary of the Department of Health & Human Services*, No. 92-0703V, 1994 WL 808593, at *2-3 (Fed. Ct. Cl. 1994), that "reimburse" reasonably "carries the connotation of a legal obligation," the court is not convinced that the meaning of "reimburse," as used in the Agreement, is unambiguous. In other words, the parties advance reasonable competing interpretations of the word "reimburse."

Moreover, RF SUNY's contention, (*see* Dkt. No. 159 at 18-19), that the language in the sentence preceding the reimbursement exclusion clause—"any milestone payments . . . pursuant to a license, sublicense or other authorization to practice TECHNOLOGY or Licensed Patents"—demonstrates that the reimbursement exclusion clause can only pertain to non-milestone payments, is a reasonable reading of the Agreement. Otherwise stated, the Agreement is susceptible to more than one reasonable interpretation as to the application of the reimbursement

16

exclusion clause to non-milestone payments, rendering it ambiguous. As such, interpretation of the reimbursement exclusion clause presents questions of fact for the jury. As made clear by the extensive briefing and evidence submitted in support thereof, if the jury should find that the reimbursement exclusion clause is applicable to a milestone payment made for R&D expenses in the absence of a prior obligation to repay, triable issues of fact remain as to whether the "reimbursement" was bona fide and the expenses considered R&D by Nektar were, in fact, R&D expenses. (*See, e.g.*, Def.'s SMF ¶¶ 42, 43, 49, 52, 70, 71, 74.)

Whether the second Bayer milestone payment is GSR turns on an interpretation of unambiguous language. As relevant here, the Agreement provides that:

> "'Gross Sublicensing Revenues' means [(1)] all non-refundable or non-creditable milestone payments or option or license fees [Nektar] and its Affiliates receive from any non-Affiliated third party in consideration of an option to negotiate for a license or other authorization to practice TECHNOLOGY or Licensed Patents, and [(2)] any milestone payments or option or license fees [Nektar] and its Affiliates receive from any non-Affiliated third party pursuant to a license, sublicense or other authorization to practice TECHNOLOGY or Licensed Patents."

(hereinafter "the GSR definitions provision"). (Dkt. No. 154, Attach. 4 at

35.)  The only reasonable interpretation of the GSR definitions provision is that refundability pertains to the first, but not the second, clause.  Indeed, the modifiers "non-refundable or non-creditable" are present in the first clause alone, and the second clause refers to "any milestone payments" as opposed to "all non-refundable or non-creditable milestone payments." (*Id.*)  The plain language indicates that non-refundability is not a requirement of the second clause.  Despite the competing interpretations offered by the parties, a refundable milestone payment "in consideration of an option to negotiate for a license or other authorization to practice TECHNOLOGY or Licensed Patents" does not meet the definition of GSR provided by the first clause of the GSR definitions provision.  Any such refundable milestone payment is excluded from the definition of GSR even if the milestone payment meets the requirements of that clause other than non-refundability.  On the other hand, a milestone payment received "pursuant to a license, sublicense or other authorization to practice TECHNOLOGY or Licensed Patents" meets the definition of GSR provided by the second clause of the GSR definitions provision whether such payment is refundable or not.  Here, there is no dispute that Bayer made the second milestone payment pursuant to a sublicense, and not in

18

consideration of an option to negotiate for a license or other authorization. (*See* Def.'s SMF ¶ 82.)  Thus, the second Bayer milestone payment is GSR under the second clause of the GSR definitions provision.

While RF SUNY did not seek summary judgment on this claim, the court may nonetheless grant it judgment because the issue has been squarely presented by Nektar.  *See New England Health Care Emps. Union, Dist. 1199, SEIU AFL-CIO v. Mount Sinai Hosp.*, 65 F.3d 1024, 1030 (2d Cir. 1995).  The only outstanding issue for trial as to RF SUNY's claim related to the second Bayer milestone payment is damages.

Pursuant to the first clause of the GSR definitions provision, the Novartis payment of $115 million is also GSR to the extent, if any, that such payment was an option fee "in consideration of an option to negotiate for a license or other authorization to practice TECHNOLOGY."  (Dkt. No. 154, Attach. 4 at 35.)  The parties dispute whether any portion of the Novartis payment was made in consideration of the option to sublicense the technology.  (*Compare* Def.'s SMF ¶¶ 143-45, *with* Pl.'s Resp. to Def.'s SMF ¶¶ 143-45, Dkt. No. 160.)  While Novartis and Nektar claim that neither assigned any value to the option, thus demonstrating that no portion of the payment was an option fee, (*see* Def.'s SMF ¶¶ 143-45),

Nektar's own expert certified licensing professional, Louis Berneman, opined that, "conceptually, in economic terms, . . . option[s] ha[ve] value," (Dkt. No. 160, Attach. 2 at 6-7, 61-62).  While the court recognizes that the first clause of the GSR definitions provision requires that some remuneration be made "in consideration of" an option in order for that payment to be GSR, an issue of fact remains regarding what, if any, portion of the Novartis payment was given in consideration of the option.

The implied covenant of good faith and fair dealing, inherent in all contracts, requires that neither party engage in behavior to destroy or injure the other's right to receive the fruits of the agreement.  *See 6243 Jericho Realty Corp. v. AutoZone, Inc.*, 71 A.D.3d 983, 984 (2d Dep't 2010).  The covenant cannot be construed in a way to nullify express contractual terms, or, in other words, an implied obligation flowing from the covenant can only be found where it is consistent with express terms of the agreement.  *See Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 304 (1983).  A claim premised on such conduct should be dismissed as duplicative if based upon the same facts underpinning a pleaded breach of contract claim.  *See MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 87 A.D.3d 287, 297 (1st Dep't 2011); *2470 Cadillac Res., Inc. v. DHL Express*

*(USA), Inc.*, 84 A.D.3d 697, 698 (1st Dep't 2011).

Nektar's argument that this claim should be dismissed as duplicative, (*see* Dkt. No. 156, Attach. 1 at 35-36), is without merit. The facts supporting the breach of contract claim related to the Bayer milestone payments are different than the basis of RF SUNY's breach of the implied covenant of good faith and fair dealing claim. *See Elmhurst Dairy, Inc. v. Bartlett Dairy, Inc.*, 97 A.D.3d 781, 784-85 (2d Dep't 2010). The latter claim is premised on RF SUNY's allegation that Nektar breached "in connection with its negotiation, drafting, execution and/or performance of" the Bayer Agreement; the former relies on Nektar's allegedly improper refusal to pay RF SUNY a percentage of the milestone payments. (2d Am. Compl. ¶¶ 85, 101.) Nektar's remaining arguments on this claim, (*see* Dkt. No. 156, Attach. 1 at 36-43), rely, in part, on assumptions about issues that will be determined during trial. Accordingly, summary judgment is denied on RF SUNY's claim of breach of the implied covenant of good faith and fair dealing.

Turning next to RF SUNY's claim denoted as "[s]pecific [p]erformance of [a]udit [r]ights," (2d Am. Compl. ¶¶ 76-82), assuming that it is properly pleaded as a "claim," it is nonetheless dismissed as moot.

*See Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 84 (2d Cir. 2005). Nektar asserts that it "agreed to permit RF SUNY to audit its books and records" after November 2009 and that RF SUNY has since obtained "robust discovery through the litigation process." (Dkt. No. 156, Attach. 1 at 44-45.) As narrowed by its response, RF SUNY contends only that "[c]ontrary to Nektar's assertions, [it] has not produced, nor denied the existence of, any valuations of the . . . [t]echnology, including valuations conducted at the time of the Novartis acquisition." (Dkt. No. 159 at 43.) However, with its reply, Nektar furnished the affirmation of Gil Labrucherie, senior vice president, general counsel, and secretary to Nektar, in which he declares that "Nektar does not currently possess any valuations of the . . . [t]echnology, including any valuations conducted at the time [that] the Novartis [Agreement] was executed." (Dkt. No. 163, Attach. 6 ¶¶ 2, 5; *see* Dkt. No. 163 at 9-10.) Labrucherie's affirmation defeats RF SUNY's sole argument against finding its claim for specific performance moot. Accordingly, RF SUNY's claim seeking specific performance is dismissed.

Finally, the cases that Nektar relies on for the proposition that RF SUNY's claim for declaratory relief must be dismissed are readily distinguishable from this case. (*See* Dkt. No. 156, Attach. 1 at 45.) In both

22

*Chevron Corp. v. Naranjo*, 667 F.3d 232, 244-45 (2d Cir. 2012), and *Dow Jones & Co. v. Harrods, Ltd.*, 237 F. Supp. 2d 394, 420 (S.D.N.Y. 2002), relief based upon the Declaratory Judgment Act (DJA), 28 U.S.C. §§ 2201-2202, was, in essence, the only claim before the court. The conclusion of those courts that dismissal was warranted because the DJA does not create an independent cause of action does not apply where, as here, there are other substantive claims asserted demonstrating an "actual controversy." 28 U.S.C. § 2201(a). Indeed, "a court may only enter a declaratory judgment in favor of a party who has a substantive claim of right to such relief." *In re Joint E. and S. Dist. Asbestos Lit.*, 14 F.3d 726, 731 (2d Cir. 1993). Even in *Alloush v. Nationwide Mutual Fire Insurance Co.*, No. 1:05-CV-1173, 2008 WL 544698, at *5-6 (N.D.N.Y. Feb. 26, 2008), the court found that, of the two pressed claims—for breach of contract and relief under the DJA—there was no breach as a matter of law, and, thus, it had no live controversy before it such that it could grant declaratory relief.

As recognized by RF SUNY, (*see* Dkt. No. 159 at 43), while the court may properly make a declaration of the future rights and obligations of the parties, its decision to so act is discretionary. *See* 28 U.S.C. § 2201(a)

("[A]ny court . . . *may* declare the rights and other legal relations of any interested party seeking such declaration." (emphasis added)); *Pub. Affairs Assocs. v. Rickover*, 369 U.S. 111, 112 (1962). "[A] court must entertain a declaratory judgment action: (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, or (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Cont'l Cas. Co. v. Coastal Sav. Bank*, 977 F.2d 734, 737 (2d Cir. 1992). It is plain to the court that both prongs are met in this case. Notably, Nektar makes no argument about whether the court should exercise its discretion. (*See* Dkt. No. 156, Attach. 1 at 45; Dkt. No. 163 at 10.) Thus, Nektar's motion is denied as to this claim.

### 2. RF SUNY's Motion

RF SUNY's motion for partial summary judgment on the breach of contract claim related to the Bayer milestone payments contains several of the same kinds of arguments it makes in response to Nektar's motion on that claim. In a nutshell, RF SUNY claims that there is no applicable reimbursement exception to the GSR-sharing provision that Nektar claims entitled it to refuse to share any portion of the milestone payments with RF

SUNY.  (*See generally* Dkt. No. 155, Attach. 1 at 11-22.)  For the reasons

stated above, *see supra* Part.IV.A.1, RF SUNY's motion for partial

summary judgment is denied.

## B. <u>Spoliation</u>

Turning to the issue of spoliation of evidence, Nektar argues that RF

SUNY's failure to preserve documents related to this litigation warrants an

adverse inference instruction and monetary sanctions—in particular,

Nektar seeks "to recover the costs and fees associated with investigating

RF SUNY's discovery failures and [its spoliation] motion."  (Dkt. No. 153,

Attach. 1 at 19.)  Nektar further contends that RF SUNY's duty to preserve

evidence arose in mid-2009, the time that it should have known that

evidence may have been relevant to future litigation, it was grossly

negligent in its efforts to preserve documents,[4] and the spoliated evidence

is relevant to Nektar's defense.  (*See id.* at 11-18.)  Specifically, on the

issue of culpability, Nektar asserts that RF SUNY was grossly negligent

because it failed "to timely issue written litigation-hold notices," "preserve

_____

[4] Nektar argues that an adverse inference instruction is warranted
even if RF SUNY was merely negligent.  (*See* Dkt. No. 153, Attach. 1 at
17.)

all relevant backup-tape data," and "suspend its auto-delete practices." (Dkt. No. 162 at 4-9; *see* Dkt. No. 153, Attach. 1 at 12-17.)  RF SUNY responds by arguing that it had no duty to preserve until October 2009, its preservation was adequate in any event, and Nektar fatally failed to identify any documents relevant to its defense.  (*See generally* Dkt. No. 158.)

After carefully reviewing the evidence, the court does not agree with Nektar that RF SUNY's document retention efforts were grossly negligent.[5] Indeed, RF SUNY had in place, since 2001, a comprehensive standard document preservation policy, issued both verbal and written litigation hold notices, preserved backup tapes of emails from before commencement, and confirmed that no custodian had deleted any documents related to this matter.  (*See* Dkt. No. 160, Attach. 2 at 246, 251-53, 261-63, 266, 271, 630.)  While there may have been some shortcomings in RF SUNY's document retention protocol, it was, at most, negligent in its effort to preserve evidence related to this litigation.  As such, the discretionary

---

[5] It is noted that RF SUNY's duty to preserve began in October 2009 when Nektar refused to fully cooperate with RF SUNY's audit, causing it to contemplate litigation.  *See Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001) ("The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation."); (Dkt. No. 160, Attach. 2 at 147, 148, 231.)

presumption articulated in *Residential Funding Corp.* does not apply in any event.

Nektar's spoliation motion fails, then, on the "inability [of Nektar] to adduce evidence suggesting the existence, let alone destruction, of relevant documents." *Kullman v. New York*, No. 8:07-cv-716, 2012 WL 1142899, at *2 (N.D.N.Y. Apr. 4, 2012). Indeed Nektar acknowledges that it would be "impossible" for it "to prove what RF SUNY may have destroyed." (Dkt. No. 162 at 10.) And, despite its contention that circumstantial evidence demonstrates that events surrounding the commencement of this litigation "likely led to a significant number of [relevant] communications," it has failed to meet its burden of establishing the relevance prong. (Dkt. No. 153, Attach. 1 at 18.) Accordingly, Nektar's spoliation motion seeking an adverse inference instruction and monetary sanctions is denied.

## V. Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that Nektar's letter motion seeking permission to file corrected versions of its memorandum of law and statement of material facts (Dkt. No. 156) is **GRANTED** and those documents are deemed

27

**FILED**; and it is further

**ORDERED** that Nektar's motion for summary judgment (Dkt. Nos. 154, 156) is **GRANTED IN PART** and **DENIED IN PART** as follows:

**GRANTED** to the extent that RF SUNY's claim for specific performance is **DISMISSED** as moot; and

**DENIED** in all other respects; and it is further

**ORDERED** that breach is established with respect to the second Bayer milestone payment, leaving only the issue of damages for resolution at trial; and it is further

**ORDERED** that RF SUNY's motion for partial summary judgment (Dkt. No. 155) is **DENIED**; and it is further

**ORDERED** that Nektar's motion for sanctions due to spoliation of evidence (Dkt. No. 153) is **DENIED**; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

May 15, 2013
Albany, New York

Gary L. Sharpe
Chief Judge
U.S. District Court